**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ANDREW D. D'ANGELO | ) | |
| | ) | |
| Plaintiff, | ) | Case Number: 18-CV-534-JPG-GCS |
| | ) | |
| v. | ) | |
| | ) | |
| CARLOS E. MARTINEZ AND IRC, L.P. | ) | |
| | ) | |
| Defendant. | ) | |

<u>**DEFENDANT CARLOS MARTINEZ'S MOTION AND MEMORANDUM OF LAW
FOR SUMMARY JUDGMENT ON ALL COUNTS AGAINST MARTINEZ**</u>

Pursuant to Federal Rule of Civil Procedure 56(a), Defendant Carlos Martinez

("Martinez"), by and through undersigned counsel, submits the following Motion and

Memorandum of Law and moves this Court to enter an Order granting him summary judgment.

### I. Introduction

In this lawsuit, Plaintiff Andrew D'Angelo ("Plaintiff") brings intentional tort claims of

assault, battery, civil conspiracy, and in-concert liability against Martinez resulting from a fight

on July 5, 2014 at the Penthouse Club (the "Club"), an East St. Louis strip club.[1]  In his Second

Amended Complaint, Plaintiff alleged that on July 4, 2014 he got into an argument with

Martinez (a member of the St. Louis Cardinals) and Martinez's friend at the Budweiser Brew

House ("Brew House") in St. Louis, Missouri.  *See* Docket No. 45 ¶¶ 7-8.  Plaintiff later left the

Brew House, stopped briefly at another nearby drinking establishment, and then headed to the

Club, where unbeknownst to him, Martinez and his group of friends had already arrived.  *See id.*

¶¶ 9-13.  While Plaintiff admits that their arrival at the Club was mere happenstance, he

nonetheless alleges that Martinez conspired with his friends to attack Plaintiff because of the

---

[1] Plaintiff also brought claims against the Club, also known as IRC.  *See* Docket No. 45.
Plaintiff did not sue any other individuals involved in the fight.  *See id.*

earlier dispute.  *See id.* ¶¶ 11-15.  Plaintiff alleges that some of Martinez's friends followed him out of the Club and "jumped" him, striking him in the face unprovoked.  *See id.* ¶¶ 15, 20.  As this attack continued, Plaintiff alleges he was hit numerous times by a variety of people (all unnamed) but specifically notes that Martinez hit him in the face.  *See id.*

Record evidence now rebuts nearly each and every one of these allegations.  First, it is now undisputed that Plaintiff and Martinez never spoke at the Brew House, let alone engaged in a verbal dispute.  Second, the evidentiary record shows that there is not a shred of support for the claim that anyone in Martinez's group (let alone Martinez) conspired to assault Plaintiff.  For example, not only was it a coincidence that both groups ended up at the Club, but there is also no evidence that Martinez knew Plaintiff was there, let alone planned to attack him.  In fact, video footage shows Martinez was not near the fight when it began, and that when he did become aware of it, he tried to stop it.  Third, discovery shows that Plaintiff's testimony that Martinez hit him is wholly contradicted by video and eyewitness testimony such that no reasonable juror could believe Plaintiff's assertion.  Finally, there is no evidence to show that Martinez assisted anyone else in doing something tortious.  For these and the reasons below, the Court should grant summary judgment, and bring an end to this frivolous lawsuit against Martinez.

## II. Background[2]

### A. The Argument at the Brew House

On July 4, 2014, Plaintiff and his friend Jake Ehlinger arrived at the Budweiser Brew House around 11 p.m.  *See* Ex. 3 at 24:8-25:24; 155:19-156:11 (D'Angelo 07/25/2018 Tr.).  They were seated at a table in the VIP lounge and were provided bottle service, and Plaintiff consumed three cocktails.  *See id.* at 31:22-32:6; 159:2-23; 160:22-25; 286:12-18.  Plaintiff and

---

[2] This section contains the statement of undisputed material facts.  Where appropriate, Martinez has identified the existence of potentially disputed facts.

Ehlinger later met some young women, one of whom was Maritza Soto.  *See id.* at 289:5-14.  At some point, Plaintiff started kissing Soto.  *See id.* at 289:15-290:12.  Later, Plaintiff went alone to a nearby bar called PBR.  *See id.* at 159:24-161:2; 297:7-298:7.  At PBR, Plaintiff had another drink before returning to the Brew House, where he had yet another drink.  *See id.* at 160:1-21.

When he returned, Plaintiff saw Soto talking to someone identified as Angel Perez, and approached them.  *See id.* at 298:11-19.  Perez happened to be at the Brew House with Martinez, two other Major League Baseball players (Marcell Ozuna and Oscar Taveras), Nate Jones, Alexa Carson, and other friends of Carson.  *See* Ex. 4 at ¶¶ 5-6 (Carson Decl.); Ex. 5 at ¶ 9 (Ozuna Decl.); Ex. 6 at 7-8 (Martinez Am. Resp. Pl. Interrog.).  An argument between Plaintiff and Perez ensued.  *See* Ex. 3 at 294:9-11; 305:4-6; Ex. 15 at 140:20-25 (Martinez Tr.)  While the specifics of the argument are in dispute,[3] it is undisputed that the argument was about Soto and did not involve Martinez.  *See* Ex. 3 at 294:9-11; 305:4-6; Ex. 15 at 140:20-25.  During the argument, Plaintiff did not see or talk to Martinez or the other players and did not know they were there.  *See* Ex. 3 at 292:10-21.  In addition, Plaintiff was not threatened during the argument; nor did Perez or anyone else say anything about attacking Plaintiff then or later.  *See id*. at 298:2-301:3.  This argument ended when people nearby intervened.  *See id.* at 299:20-300:1.

### B.  Plaintiff's Arrival at the Club

Around 2:00 a.m. on July 5, 2014, Plaintiff and Ehlinger left the Brew House and drove in Ehlinger's car, an Aston Martin, to the Pepper Lounge, another bar in St. Louis.  *See* Ex. 3 at 161:15-162:3; 279:17-218:13; Ex. 7 at 10:4-13 (D'Angelo 07/26/2018 Tr.).  While there, they

---

[3] Plaintiff testified that Soto looked uncomfortable, and that he intervened to protect her, *see* Ex. 3 at 293:4-294:3, while Soto testified that Plaintiff was upset that Soto was talking to another man, and intervened for this reason, *see* Ex. 17 at 94:1-95:19 (Soto Tr.).

decided to leave and drove to the Club, where they arrived between 3:00 a.m. and 3:15 a.m.  *See* Ex. 7 at 10:7-16; 10:23-11:3.

When he got to the Club, Plaintiff had not eaten for hours, but had consumed five cocktails and admits he "might have been buzzed."  *See* Ex. 3 at 164:4-5; Ex. 7 at 13:15-24; Ex. 8 at 8 (Pl.'s Third Suppl. Resp. to Def. IRC First Set of Interrogs.).  At the Club, it would have been "typical" for Plaintiff to consume a shot of "Fireball" whiskey, but Plaintiff stated that he was not sure he did so on that specific night.  *See* Ex. 8 at 8; Ex. 7 at 12:1-13.  After arriving at the Club, Ehlinger and Plaintiff decided to get something to eat at the food stand in the parking lot.  *See* Ex. 7 at 13:1-14:2.  In total, they spent less than five minutes inside the Club and did not discuss the incident at the Brew House before heading outside.  *See id.*  Unbeknownst to Plaintiff, Martinez and his friends were already at the Club when they arrived.  *See* Ex. 4 at ¶ 8; Ex. 6 at 7-8; Ex. 7 at 11:19-14:2.  Plaintiff testified that he and Ehlinger did not interact with Martinez or the others before going to the food stand.  *See* Ex. 7 at 12:14-13:11.  Similarly, Martinez was not aware that Plaintiff was at the Club.  *See* Ex. 4 at ¶¶ 9, 16; Ex. 5 at ¶¶ 11, 14.

**C.  The Fight**

The fight that is the subject of this lawsuit took place in two separate areas of the Club's parking lot, first near the food stand and second in the front of the lot, closer to the main entrance.  The Club's surveillance system recorded the fight from three different angles.  *See* Ex. 9 (IRC Recordings); Ex. 10 at 22:3-23:1 (IRC Rule 30(b)(6) Westerheide Tr.); Ex. 11 (Composite Video).[4]  Plaintiff contends that surveillance video of the second part of the fight (near the main entrance) is unclear and thus inconclusive regarding what occurred, but an

---

[4] Several parties produced these videos in separate files.  *See, e.g.*, Ex. 9.  For ease of reference, Martinez generated a single composite of those videos which shows the events as they unfolded in real time.  *See* Ex. 11.  The references in this motion are to that composite video, although witnesses testified about individual videos and the time stamps are identical on both.

indisputably clear video was made by Abdifatah Abdi, a taxi cab driver present that night ("Abdi Video").  *See* Ex. 12.  The Club videos show the time and date while the Abdi Video shows the running time.

That night, and in these recordings, the relevant people have been identified as follows:

- **Plaintiff:** A white male wearing a "whitish" or light-colored shirt.  *See* Ex. 13 at 272:14-273:9 (Mark Rambo Tr.); Ex. 10 at 88:1-16.

- **Ehlinger:** A "taller" white male wearing a "blue shirt."  *See* Ex. 13 at 272:14-273:9; Ex. 10 at 88:1-16.

- **Hope:** A white male wearing "dark pants," a "red shirt," and a backwards "baseball hat."  *See* Ex. 14 at 27:23-28:8  (John Hope Tr.).

- **Perez:** A "stocky black male in [a] plaid shirt."  *See* Ex. 13 at 250:6-17.

- **Jones:** A "dark skinned man with [a] red shirt."  *See* Ex. 15 at 100:6-8.

- **Taveras:** A "tall black male wearing a white shirt."  *See* Ex. 13 at 248:10-20.

- **Ozuna:** A "taller male wearing a red/orange or similar colored shirt."  *See* Ex. 4 ¶ 12; Ex. 13 at 316:18-23.

- **Martinez:** A shorter man with a "mohawk," "wearing a red or similar colored v-neck shirt."  *See* Ex. 4 ¶ 12; Ex. 13 at 36:5-9.

### 1.   The First Part of the Fight - The Altercation at the Food Stand

The first part of the fight began in the early morning of July 5, 2014, after Plaintiff left the Club to go to the food stand.  That night, there were many people by the food stand; indeed, between 3:15:33 a.m. and 3:24:08 a.m., there were over a dozen people nearby.  *See* Ex. 11 (Outside <u>Right</u>).[5]  At approximately 3:16:24 a.m., Plaintiff and Ehlinger left the Club and walked towards the food stand.  *See* Ex. 11 (Outside <u>Right</u>); Ex. 7 at 15:2-24; Ex. 13 at 271:23-273:9;

---

[5] The "Outside <u>Right</u>" video recorded the altercation at the food stand.  The "Outside Center" camera recorded the area in front of the Club exit, and shows people leaving the Club and the food stand.  The "Outside <u>Left</u>" video shows the entire second part of the fight, although Plaintiff contends that the video is unclear.

Ex. 10 at 88:1-16.  At approximately 3:18:42 a.m., John Hope, an eyewitness, also left the Club and walked towards the food stand, where he stood near Plaintiff and Ehlinger.  *See* Ex. 14 at 61:6-9; 62:24-63:4; Ex. 11 (Outside Right).  At approximately 3:19:09 a.m., Perez, Jones, and Taveras exited the Club.  *See* Ex. 11 (Outside Right); Ex. 15 at 52:25-53:17.  Perez exited first, ahead of the others.  *See* Ex. 11 at 3:19:09 a.m. (Outside Right).  The three men walked towards the food stand—they did not run and did not appear to be conversing or exchanging gestures. *See id.*; Ex. 13 at 275:4-6.  At approximately 3:19:20 a.m., shortly after they reached the food stand, the fight began.  *See* Ex. 11 (Outside Right); Ex. 14 at 62:1-23.

There is some dispute about how the fight started.  Plaintiff testified that he was standing by the food stand when he heard yelling and was "sucker-punched" "out of the blue."  *See* Ex. 7 at 16:19-18:9.  The video and witness deposition testimony, however, tell a far different story. Hope, who was standing nearby, testified that the incident began when a dark-skinned person approached Plaintiff, said something akin to "What's up now" or "What's up now motherfucker."  Ex. 14 at 63:23-64:20.  Plaintiff stated that he heard yelling, but that he could not hear what was said.  *See* Ex. 7 at 16:19-17:23.  Hope then observed *Plaintiff* push the dark-skinned man, after which the dark-skinned man punched Plaintiff.  *See* Ex. 14 at 62:14-16; 63:5-20; 64:24-65:9; 66:10-18; 164:2-165:13.  The fact that Plaintiff started the physical altercation is confirmed by video.  *See* Ex. 11 at 3:19:26 a.m. (Outside Right); Ex. 16 at 93:18-24; 95:9-13 (IRC Rule 30(b)(6) Ocello Tr.); Ex. 10 at 91:5-18.  It is undisputed that during this time nobody mentioned Martinez, a plan to hit Plaintiff, hitting or punching Plaintiff, or the incident at the Brew House.  *See* Ex. 7 at 17:18-20; Ex. 14 at 79:1-9.  There is also no evidence of gestures indicating that anyone was going to hit Plaintiff.  *See, e.g.*, Ex. 14 at 63:23-64:20; Ex. 7 at 16:19-17:23; Ex. 11 at 3:19:26 a.m. (Outside Right).

There is no dispute that Martinez was not involved in that part of the fight.  Martinez exited the Club at approximately 3:19:19 a.m., planning to leave the Club altogether.  *See* Ex. 15 at 53:18-22; 55:11-15; 56:22-57:14; 253:12-22; Ex. 4 at ¶ 10.  At approximately 3:19:26 a.m., Martinez headed in the direction of his car and gestured to someone else to come with him.  *See* Ex. 15 at 53:18-22; 55:11-15; 56:22-57:14; 253:12-22; Ex. 4 at ¶ 10; Ex. 11 at 3:19:19-3:19:26 a.m. (Outside Center).  At this point, Martinez was not aware that a fight had started or that Plaintiff was at the Club.  *See* Ex. 15 at 55:11-15; 56:22-57:14; 253:12-22; Ex. 7 at 12:14-13:11; Ex. 4 at ¶¶ 9, 16; Ex. 5 at ¶¶ 11, 14.  Then, at approximately 3:19:29 a.m., after the fight had already begun, Martinez turned in the direction of the food stand and observed something.  *See* Ex. 11 (Outside Center); Ex. 15 at 56:22-57:14.  Martinez then headed towards the food stand to "see what was happening."  *See* Ex. 15 at 60:9-25.  At approximately 3:19:41 a.m., as Martinez approached, Taveras punched Ehlinger.  *See id.* at 62:3-63:22; Ex. 7 at 24:2-28:5.  Martinez threw his arms around Taveras and dragged him away in order to deescalate the situation.  *See* Ex. 15 at 63:23-64:6; Ex. 11 at 3:19:41-3:19:47 a.m. (Outside Right).

### 2.  The Second Part of the Fight – In Front of the Club

Following that, the physical fight stopped and people moved away from the food stand and started walking towards the main entrance near the front of the Club.  *See* Ex. 11 (Outside Right); Ex. 13 at 287:19-25.  Mark Rambo, a Club employee, approached Taveras, who stated that he was leaving and started walking towards his car.  *See* Ex. 13 at 27:12-28:2; 30:2-5; Ex. 10 at 97:5-9.  Others also started heading in the same direction, including Jones (at 3:19:55 a.m.) and Amanda Steinbecker (wearing a red skirt and white shirt, at 3:19:59 a.m.).  *See* Ex. 11 (Outside Center); Ex. 15 at 71:19-25; 72:1-9; Ex. 13 at 27:21-28:2; Ex. 4 at ¶ 12.  At approximately 3:20:01 a.m., Ehlinger also walked near the front of the Club in the same direction

7

as the others; in doing so he walked quickly, appeared animated, and was followed by Club employees.  *See* Ex. 11 (Outside Center); Ex. 14 at 68:5-69:22; Ex. 13 at 287:1-8.

Martinez, however, is not involved in this interaction at all.  While Martinez walked in the same direction, he was behind Ehlinger, Taveras, Jones, and others; moreover, Martinez was not running, gesticulating, or being restrained or followed by security.  *See* Ex. 11 at 3:20:06-3:20:15 a.m. (Outside Center); Ex. 13 at 306:17-307:22.  Rather, he walked casually and alone, with his hands behind him.  *See id.* at 306:17-307:22.  Plaintiff was a few yards behind Martinez. *See* Ex. 11 at 3:20:16 a.m. (Outside Center).  The two did not talk or interact in any way.  *See id.*

At some point after this, the second part of the fight began.  According to Plaintiff, as he was walking from the food stand towards the front of the Club, he saw Ehlinger yelling at a group of people who Plaintiff believed were hitting Ehlinger.  *See* Ex. 7 at 23:14-24:21.  Plaintiff then ran towards the group, *see id.* at 24:22-25, and threw a punch towards a "darker" "real skinny" man wearing a red shirt, *see id.* at 25:3-10.  Plaintiff contends that, during this interaction, someone, who he later identified as Martinez, struck him in the right side of his face, knocking him unconscious and to the ground, where he may also have been punched or kicked. *See id.* at 26:15-19; 31:12-32:20; 34:2-36:22.  After gaining consciousness, Plaintiff got up and tried to stop Ehlinger from yelling.  *See id.* at 37:17-38:5.  Plaintiff was unable to confirm that he was actually punched or kicked on the ground, and if so, who did it.  *See id.* at 33:12-36:8.  The only contention from this narrative that is relevant to this motion is whether Martinez punched Plaintiff, but for the reasons below, that is flatly contradicted by the record.

The "Outside Left" and Abdi Video both recorded the second fight.  Although Plaintiff contends that the "Outside Left" video is not clear, it does not show Martinez hitting Plaintiff. *See* Ex. 11.  In addition, the Abdi Video does not show what Plaintiff says occurred.  It is

undisputed that at no point in the Abdi Video does Martinez hit, strike, kick or even touch Plaintiff. *See* Ex. 7 at 55:15-56:16. In addition, in the beginning of the Abdi Video, Club employees are holding Perez on the ground. *See* Ex. 12 at 00:05-00:10; Ex. 15 at 44:17-18; 93:6-9; Ex. 13 at 322:19-23; Ex. 10 at 99:25-100:21. Rambo, an eyewitness, described Perez as "the main aggressor," which is why he was held down. *See* Ex. 13 at 327:25-328:16. The recording shows that at around the same time, Ehlinger continued walking towards Martinez and others, but was being held back by Joe Blackburn, one of the Club's security directors. *See* Ex. 13 at 323:15-22; Ex. 12 at 00:00-00:09. While Perez was on the ground, Martinez approached Club employees to speak to them. *See* Ex. 12 at 00:13; Ex. 13 at 327:15-16. Shortly after that, around 00:17, someone yelled "let's go" in Spanish. *See* Ex. 12; Ex. 4 at ¶ 13. Around the same time, Ozuna and Taveras began to walk away, Perez was released, and he and others began walking away. *See* Ex. 10 at 102:21-24; Ex. 12 at 00:18-00:26.

Ehlinger, however, continued to yell, swear, gesticulate, walk around, and approach the group. *See* Ex. 12 at 00:20-00:29; Ex. 13 at 330:10-25; Ex. 14 at 71:12-72:14. Multiple Club security staff members surrounded him at this time. *See id.* At approximately 00:29, Ehlinger yelled "You motherfuckers are dead." *See* Ex. 12; Ex. 4 ¶ 13. At 00:32, Martinez, who was several feet away from Ehlinger, ran towards Ehlinger and attempted to hit or did hit him. *See* Ex. 12.[6] There is no dispute that Martinez did not hit Plaintiff at this time. *See* Ex. 7 at 43:5-6.

After that, and without any involvement or encouragement by Martinez, Ozuna punched Plaintiff twice. *See* Ex. 7 at 44:5-46:25. The first time, Ozuna ran toward Plaintiff and swung at him from behind. *See* Ex. 12 at 00:37; Ex. 7 at 44:23-45:9. Plaintiff then turned around and

---

[6] There is a dispute as to whether Martinez actually hit Ehlinger. *See* Ex. 7 at 41:6-42:2; Ex. 15 at 45:23-46:8; 98:2-99:2; Ex. 13 at 30:7-25. Those differences, however, are not material to Plaintiff's claims against Martinez.

started towards Ozuna, yelling at him.  *See* Ex. 12.  At one point, Plaintiff yelled to Ozuna "Do you want to get shot?," reached towards the back of his pants, and continued walking towards Ozuna.  *See* Ex. 7 at 45:18-24; Ex. 13 at 332:23-25; 334:12-23; Ex. 12 at 00:43-00:48.[7]  Seconds later, Ozuna punched Plaintiff in the face.  *See* Ex. 12 at 00:49; Ex. 7 at 55:18-56:9.  Club staff then quickly restrained Ozuna.  *See* Ex. 15 at 101:2-11; Ex. 12 at 00:51.  After that, the physical fight ended.  *See* Ex. 7 at 44:5-46:25.  During this series of events, none of the individuals referenced the incident at the Brew House.  *See, e.g.*, Ex. 7 at 47:8-18; Ex. 13 at 368:8-16.

### 3.  No Eyewitnesses Identified Martinez as Punching Plaintiff

After the incident on July 5, 2014, Plaintiff did not know who threw the alleged punch that he now blames on Martinez.  *See* Ex. 3 at 247:18-20; Ex. 7 at 29:9-17.  When asked how he eventually identified Martinez, Plaintiff testified that two days after the incident he looked at images of the Cardinals baseball team online so he could "figure out who attacked me."  *See* Ex. 7 at 47:25-49:13.  Plaintiff saw a photo of Martinez and believed that was the person who hit him.  *See id.* 49:10-13.

However, despite the many witnesses to this incident, not a single other person observed Martinez hit Plaintiff.  Rather, discovery revealed the following:

- On July 5, 2014, Joseph Blackburn, Christopher Harper, Larry Scott, Edward West, and Mark Rambo, Club employees who observed and helped to break up the fight, wrote witness statements about their observations.  *See* Ex. 18 (Harper Statement); Ex. 19 (West Statement); Ex. 20 (Blackburn Statement); Ex. 21 (Rambo Statement); Ex. 22 (Scott Statement).  This is the normal and routine practice of Club employees.  *See* Ex. 13 at 234:8-11.  None of these statements identified Martinez as having hit Plaintiff.  *See* Exs. 18-22; *see also* Ex. 10 at 150:3-151:20 (IRC Rule 30(b)(6) testimony that none of the witness statements state that Martinez struck Plaintiff).

- The Sauget Police Department investigated the incident.  Between approximately July 5 and July 16, 2014 their interviews included the following eyewitnesses:  Martinez (Ex. 23

---

[7] Club employee Mark Rambo testified that, in his experience, it looked like Plaintiff was reaching for a gun.  Ex. 13 at 334:20-335:7.

(Interview Video)),[8] Greg Wheatley, the vendor at the food stand (Ex. 24 (Interview Report)), Abdi (Ex. 25 (Interview Video)), Rambo (Ex. 26 (Interview Video)), and Blackburn (Ex. 27 (Interview Report) & Ex. 28 (Interview Video)).  Plaintiff's counsel refused to let Plaintiff participate in an interview.  *See* Ex. 29 (Interview Report).  It is undisputed that, in all of the statements and interviews, not a single witness identified Martinez as punching Plaintiff.

- Rambo, a Club employee and witness to the fight, was deposed by Plaintiff.  Rambo observed both part of the incident at the food stand and the fight that followed once the group moved to the front of the Club.  *See* Ex. 26.  Through various statements, including his interview with the police, Rambo was clear that he never saw Martinez strike Plaintiff.  *See* Ex. 13 at 234:25-235:6; 241:2-18; Ex. 26.  Rambo identified everyone who struck or hit Plaintiff during the second part of the fight, identifying Ozuna, Perez, Tavares, and Jones by description.  *See* Ex. 13 at 234:25-235:6; 241:2-18; Ex. 26.

- Alexa Carson and Marcell Ozuna, who were with Martinez that evening and in the Club parking lot for the second part of the fight, also stated that they did not see Martinez hit Plaintiff.  *See* Ex. 4 at ¶¶ 13, 15; Ex. 5 at ¶¶ 13, 15.

- Martinez has repeatedly stated that he did not punch Plaintiff.  *See, e.g.*, Ex. 15 at 22:10-12; Ex. 23.

While not a single person stated that Martinez hit Plaintiff—including Ehlinger who was not deposed in this litigation[9]—Plaintiff testified that Hope, an eyewitness to the fight, would agree that he saw Martinez punch him.  *See* Ex. 3 at 46:6-49:18.  Plaintiff testified that some years after the incident, Hope allegedly told him that he "witnessed me getting hit by Martinez" and "he remembers me getting knocked out by Carlos Martinez."  *See id.*  Hope was deposed in this case.  While Plaintiff and Hope did discuss the fight in February or March of 2017, *see* Ex. 31 at 15:21-16:4; Ex. 14 at 19:10-20:12, Hope testified that he *never* told Plaintiff that he saw him get hit by Martinez, *see* Ex. 14 at 14:24-15:5; 19:10-20:12; 53:23-55:7.  Hope was also

---

[8] The police interviewed Martinez and a teammate provided the translation.  The video is being provided as is because it is being cited only for the proposition that Martinez never stated that he punched Plaintiff.  If it would be helpful, Counsel can provide a full translation.
[9] Despite numerous efforts by Martinez to serve Ehlinger with a subpoena for a deposition and requests to Plaintiff's counsel for assistance, Ehlinger evaded service and Martinez was unable to depose him during discovery.  *See* Ex. 30 (Affidavit & Emails).

unequivocal on the following point: he never saw Martinez strike Plaintiff.  *See id.*  He expressly, and repeatedly, denied making these statements to Plaintiff.  *See id.*

### D. Plaintiff's Claims

 In January 2018, Plaintiff filed a Complaint that included the allegation that Martinez had committed a battery by punching him in the face.[10]  *See, e.g.*, Docket No. 1.

### III. Legal Argument

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party satisfies its burden by "citing to particular parts of materials in the record, including depositions,

---

[10] Like the Complaint itself, the filing of the Complaint was accompanied by many statements by Plaintiff's representatives to the media that focused on *Martinez's* alleged conduct, rather than on the actions of anyone else.  *See* Ex. 1 (News Articles); Ex. 2 (Emails).

documents, electronically stored information, affidavits … interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), or by establishing the "absence of evidence to support the nonmoving party's case," *see Celotex*, 477 U.S. at 325.  While the Court must "view the evidence and draw all inferences in a way most favorable to the nonmoving party," *Szymanski v. Rite-Way Lawn Maint. Co.*, 231 F.3d 360, 364 (7th Cir. 2000), the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

### A. The Court Should Grant Summary Judgment on the Civil Conspiracy Claim

The Court should grant summary judgment as to Count III (civil conspiracy) because there is not a shred of evidence that Martinez, or anyone else for that matter, conspired to attack Plaintiff.  To establish a civil conspiracy under Illinois law, Plaintiff must show that: "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act."  *See, e.g.*, *Redelmann v. Claire Sprayway, Inc.*, 874 N.E.2d 230, 240 (Ill. App. 3d 2007).  The existence of an agreement by *all* participants is "a necessary and important element of this cause of action."  *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (citing *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994)).  Moreover, the agreement must be "a single plan, the essential nature of which was known to *each* person."  *Plambeck v. Stone*, 662 F. Supp. 298, 301 (N.D. Ill. 1986) (citations omitted) (emphasis added).

Plaintiff's claim for civil conspiracy against Martinez fails for two fundamental reasons: there is no evidence that the alleged participants acted in concert or pursuant to a

common design, and even if there were, there is no evidence that *Martinez* knew about and

knowingly agreed to participate or assist in any scheme.

### 1. There is No Evidence Showing a Common Plan Among the Purported Participants

Even taking all reasonable inferences in favor of Plaintiff, no reasonable juror could find

an iota of evidence supporting the existence of an agreement between the alleged participants.

As an initial matter, Plaintiff's theory of his conspiracy claim—at least as laid out in the instant

Complaint—is completely unsupported, and frequently contradicted, by the factual record

developed in discovery.  First, Plaintiff alleged that Martinez argued with Plaintiff at the Brew

House—this argument was supposedly the reason why Martinez later decided to assault Plaintiff.

Docket No. 45 ¶¶ 7-8.  But Plaintiff testified that he never met Martinez at the Brew House, let

alone argued with him.  *See supra* at 2-3.  Plaintiff was not even aware Martinez was at the Brew

House.  *See id.*  Second, Plaintiff claimed that Martinez and his friends saw Plaintiff inside the

Club, after which they agreed to attack him in "retribution for the verbal dispute between

Defendant Martinez, [Perez], and Plaintiff."  Docket No. 45 ¶¶ 10-14.  But there is no evidence

that Martinez saw Plaintiff inside the Club, and Plaintiff himself agrees that he did not see

Martinez or anyone related to him inside the Club.  *See id*. at 3-4.

Third, Plaintiff also alleged that "one or more members of Martinez's Group … followed

Plaintiff out of said strip club and 'jumped'" him.  Docket No. 45 ¶ 15.  Again, the factual record

now confirms the opposite: Plaintiff was not "followed" outside.  Rather, Perez, Jones and

Taveras left the Club approximately three minutes after Plaintiff left.  *See supra* at 5-6.  And

when they did leave, there was no sudden rush to attack Plaintiff, rather they merely walked

towards the food stand—a busy area where multiple people were gathered.  *See id.*  While

Plaintiff asserts that he was "sucker punched," video and eyewitness testimony show that the

14

physical fight began after *Plaintiff* pushed someone.  *See id.*; *see, e.g.*, *Scott*, 550 U.S. at 380

(court may credit video where it "utterly discredit[s]" plaintiff's version of events).[11]  Moreover,

Martinez exited the Club intending to leave, not even aware a fight had started.  *See supra* at 6-7.

Fourth, Plaintiff alleged that immediately prior to hitting Plaintiff, "one or more

members" of the group "verbally announced his/their acknowledgment of Plaintiff's

involvement" in the argument at Brew House.  *See* Docket No. 45 ¶ 15.  But again, there is no

evidence of such a statement in the factual record.  Plaintiff testified that he heard yelling, but

could not recall what was said.  *See supra* at 6.  The only testimony about what was said came

from Hope, who testified that the person who approached Plaintiff said something like "What's

up now" or "What's up now motherfucker" before Plaintiff pushed that person.  *See id*.  At best,

the statement shows that this person may have recognized Plaintiff from another encounter, but it

is far from sufficient to establish a singular, coordinated plan to attack Plaintiff—much less one

that can be ascribed to all the other participants in the fight.

Lastly, there are a host of additional undisputed facts that show Plaintiff's conspiracy

claim is without any factual support.  There is no evidence that, at *any* point in the fight, there

were any statements or gestures made showing the existence of an agreement to attack Plaintiff,

or any explicit references to the Brew House incident at all.  *See supra* at 6, 10.  And on multiple

occasions the alleged participants in the supposed conspiracy attempted to leave or deescalated

the situation.  *See supra* at 7-9.[12]  In short, there is no evidence to show the existence of an

agreement between the parties.  Rather, the picture that emerges from the undisputed facts is one

---

[11] Even if the Court were to credit the statement that he was punched "out of the blue," that is insufficient to support a conspiracy claim given the lack of any other evidence of an agreement.
[12] Because Plaintiff has provided no evidence of a conspiracy whatsoever, the fact that he may have been hit or punched during the fight is immaterial to the conspiracy claim.

of a hectic, impromptu, and unexpected fight that started after Plaintiff, who happened to run into someone that he had argued with earlier (not Martinez), pushed that person.

Indeed, in cases alleging a civil conspiracy claim based on an assault or a fight, courts interpreting Illinois law have readily granted summary judgment in favor of defendants in similar circumstances.  In *Lyons*, the district court granted summary judgment on a civil conspiracy claim arising out of a fight involving multiple police officers attacking a bar patron at the same time.  *See Lyons v. Adams*, 257 F. Supp. 2d 1125 (N.D. Ill. 2003).  In that case, the plaintiff and an officer exchanged words, after which the plaintiff "asked what the problem was," and the officer stated "I'll show you my problem."  *Id.*  The officer then punched the plaintiff, the two "started fighting," and other officers jumped in the fight.  *See id.*  Summary judgment was granted because there was "no evidence that his beating was the product of any sort of agreement" by the officers "[t]o the contrary … the evidence confirms that the beating was essentially a spontaneous event."  *Id.* at 1136.  In *Henderson v. Hartshorn*, video footage showed that after a plaintiff inmate was "disrepect[ful]," a number of correctional officers entered his cell at the same time, and at various points grabbed him, threw him to the ground, and struck him.  No. 08-CV-2086, 2011 WL 11464, at *1-2 (C.D. Ill. Jan. 4, 2011).  The district court granted summary judgment stating "that the officers acted together does not, in itself, justify the inference that they acted pursuant to an agreed plan" and therefore plaintiff had provided "mere speculation" in support of his civil conspiracy claim.  *See id.* at 7-8.  As these and other cases recognize, evidence of a fight or physical altercation involving multiple participants, even acting at the same time, is woefully insufficient to show the existence of an agreement that would support a claim for civil conspiracy.  *See also Plambeck*, 662 F. Supp. at 301.

**2.  There is No Evidence that Martinez Knew About or Agreed to a Conspiracy**

Even assuming there was evidence of some type of agreement or plan between others, for the claim to proceed against Martinez, Plaintiff must show a genuine dispute of material fact as to *Martinez's* specific knowledge, assent to, and participation in the common scheme. *See id.*; *see also Redelmann*, 375 Ill. App. 3d at 924. There is not an iota of record evidence that would satisfy those basic elements of a conspiracy claim.

Here, it is undisputed that Martinez: (1) played no role in the dispute at the Brew House, *see supra* at 2-3; (2) did not see Plaintiff when he arrived at the Club, *see supra* at 2-4, 6-7; and (3) was not involved in or aware of the fight at the food stand, and when he finally *did* become aware of the fight, he tried to *deescalate* the situation by dragging his teammate away, *see supra* at 6-7. That is not the behavior of someone who has agreed to be part of a plan to attack anyone—to the contrary, it shows complete lack of awareness regarding any agreement. Martinez's behavior following the fight at the food stand, particularly the lack of any animosity or interaction whatsoever between Martinez and Plaintiff, further underscores his complete lack of awareness about any alleged plan. *See supra* at 7-9. Thus, even if the Court were to credit Plaintiff's testimony that Martinez actually struck Plaintiff, that would be insufficient to establish a civil conspiracy without proof that (1) a conspiracy to attack Plaintiff was formed; (2) Martinez knew about the purported conspiracy; and (3) Martinez knowingly joined the conspiracy to attack Plaintiff. *See, e.g.*, *Doe v. Brouillette*, 906 N.E.2d 105, 124 (Ill. App. 3d 2009) (granting summary judgment because absence of evidence that defendant knew about agreement).

**B. The Court Should Grant Summary Judgment on the Assault and Battery Claims**

In Counts I and II, Plaintiff alleges state law claims of assault and battery on the theory that Martinez punched him in the face. In Illinois, an assault is the "intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a

well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented." *See, e.g.*, *Parrish ex rel. Bowker v. Donahue*, 443 N.E.2d 786, 788 (Ill. App. 3d 1982).  A battery is "the wilful touching of the person of another or a successful attempt to commit violence on the person of another."  *See id.*

The Court should grant summary judgment to Martinez on these counts because the video and eyewitness testimony show that Martinez never hit Plaintiff, and therefore in light of the undisputed factual record no reasonable jury could believe Plaintiff's claim.  To be sure, the Court must weigh all inferences in Plaintiff's favor, *Szymanski*, 231 F.3d at 364, and consider Plaintiff's own testimony in deciding a motion for summary judgment, *see, e.g.*, *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).  However, as the Supreme Court has held, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott*, 550 U.S. at 380; *see also Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009) (citations omitted) ("uncorroborated, self-serving testimony cannot support a claim if [it is] … 'inherently implausible'").  Thus, numerous cases have held that summary judgment is appropriate when video recordings contradict or undercut the plaintiff's version of events.  *See, e.g.*, *Scott*, 550 U.S. at 380; *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016); *Boyd v. Pollard*, 621 F. App'x 352, 356 (7th Cir. 2015);.  Separately, courts are also free to reject plaintiff's testimony during summary judgment if it "is based on 'speculation, intuition, or rumor.'"  *See Darchak*, 580 F.3d at 631 (citations omitted).

As an initial matter, Plaintiff's testimony that Martinez hit him finds no support in the video record or extensive eyewitness testimony, and thus no reasonable juror would believe it.

18

*See, e.g.*, *Scott*, 550 U.S. at 380; *Boyd*, 621 F. App'x at 356.  It is undisputed that *none* of the videos show Martinez punching Plaintiff.  *See supra* at 5-6, 8-10.  Martinez's behavior in the videos is entirely inconsistent with someone who punched Plaintiff.  As the videos show, Martinez tried to deescalate the fight at the food stand.  *See supra* at 6-7.  And *after* Martinez supposedly hit Plaintiff, Club employees held Perez on the ground, suggesting that he was the perpetrator.  *See supra* at 8.  In addition, there is no evidence of any animosity between Martinez and Plaintiff, before or after Martinez supposedly punched him, while the videos show other people hitting Plaintiff.  *See supra* at 6-7, 9-10.  Given this record, no reasonable jury could believe Plaintiff's claim regarding Martinez.  *See also Gillis v. Pollard*, 554 F. App'x 502, 503 (7th Cir. 2014); *Johnson v. Moeller*, 269 F. App'x 593, 596 (7th Cir. 2008).

Two other aspects of discovery further confirm the absence of any genuine material factual dispute.  First, the complete absence of a single other witness identifying Martinez as having hit Plaintiff, including John Hope, who Plaintiff stated would corroborate his claim.  *See supra* at 10-11.  ███████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████

Finally, that Plaintiff's testimony is based on speculation is a separate basis to find that there is no material factual dispute on this issue.  Plaintiff's testimony shows his confusion about what happened around the time that Martinez supposedly punched him, (e.g., what happened on the ground, who was responsible) and shows that his ability to observe and recall the events was

███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

further impaired by the alcohol he consumed.  *See supra* at 2-4, 8, 10.  It might be appropriate to credit this speculative testimony if Plaintiff's identification had any support in the factual record. However, as in *Scott* and other cases, when the record so blatantly contradicts his version of events, the Court should grant summary judgment.

### C. The Court Should Grant Summary Judgment on the In-Concert Liability Claim

The Court should also grant summary judgment on the in-concert liability claim under the Restatement (Second) of Torts § 876 (Count IV).  That claim has three iterations: in the first, the defendant must engage in "a tortious act in concert with the other or pursuant to a common design with him;" the second and third require, in relevant part, that the defendant provide "substantial assistance" to others committing a tortious act; the third also requires that the defendant's conduct "constitute[] a breach of duty" to the plaintiff.  *See* Restat. (Second) of Torts § 876.  No genuine material dispute exists about any of these elements.  First, for the same reasons as the undisputed evidence is insufficient to establish a civil conspiracy claim, it is also insufficient to show that Martinez acted in concert with anyone or pursuant to a "common design."  *See supra* at 14-18.  Second, there is no evidence that Martinez provided "substantial assistance" to another person.  No reasonable juror could find that Martinez punched Plaintiff, s*ee supra* at 18-20, and separately there is no evidence that Martinez caused another person to do anything tortious or provided any assistance to anyone else who hit Plaintiff, *see supra* at 14-18. For these reasons, there is also no evidence that Martinez's conduct breached a duty to Plaintiff.

### IV. Conclusion

For the reasons stated, summary judgment should be granted for Martinez.  In light of the factual detail related to this motion and the benefit of reviewing the video with the Court, a hearing is requested on this motion.

Dated: March 5, 2019                    Respectfully submitted,

                                        /s/ Gabriel E. Gore_____
                                        Gabriel E. Gore
                                        Arsenio L. Mims #6317837
                                        DOWD BENNETT LLP
                                        7733 Forsyth Blvd., Suite 1900
                                        St. Louis, MO 63105
                                        Tel: (314) 889-7300
                                        Fax: (314) 863-2111
                                        ggore@dowdbennett.com
                                        amims@dowdbennett.com

                                        /s/ Jon R. Fetterolf (with consent)_____
                                        Jon R. Fetterolf (D.C. Bar No. 479225)
                                        Margarita K. O'Donnell Morales (D.C. Bar No.
                                        1005972)
                                        *Pro Hac Vice*
                                        ZUCKERMAN SPAEDER LLP
                                        1800 M Street N.W. Suite 1000
                                        Washington, D.C. 20036
                                        Tel: (202) 778-1800
                                        Fax: (202) 822-8106
                                        jfetterolf@zuckerman.com
                                        modonnell@zuckerman.com

                                        *Attorneys for Carlos E. Martinez*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 5, 2019, the foregoing document was filed electronically with the Clerk of Court and served by operation of the Court's electronic filing system upon all counsel of record.  I further certify that Exhibits 9, 11, 12, 23, 25, 26, and 28 to the foregoing document are video files that will be served via Federal Express on all parties via counsel for Plaintiff, Dan Farroll and counsel for IRC, Meg Fowler ██████████████████████████████████████ ████████████████████████████████████████████████████████.

/s/ Arsenio Mims

## <u>CERTIFICATE OF SERVICE FOR CORRECTED CARLOS MARTINEZ'S MOTION AND MEMORANDUM OF LAW FOR SUMMARY JUDGMENT ON ALL COUNTS AGAINST MARTINEZ</u>

I hereby certify that on April 8, 2019, the foregoing document was filed electronically with the Clerk of Court and served by operation of the Court's electronic filing system upon all counsel of record.  I further certify that Exhibits 9, 11, 12, 23, 25, 26, 28, and 32 were previously served or provided to counsel of record, including counsel for Plaintiff, Dan Farroll and counsel for IRC, Meg Fowler.  *See* ECF No. 80-81.

/s/ Arsenio Mims