UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ANDREW F. D'ANGELO,

    Plaintiff,

v.

CARLOS E. MARTINEZ and IRC LP,

    Defendants.

Case No. 3:18-cv-00534-JPG-GCS

## MEMORANDUM AND ORDER

**J. PHIL GILBERT, DISTRICT JUDGE**

Plaintiff Andrew D'Angelo says that defendant Carlos Martinez (1) conspired with others to attack D'Angelo outside of a nightclub, and then (2) punched D'Angelo in the face. Martinez now moves for summary judgment. (ECF No. 94.) Because there is no evidence that Martinez did any of these things, the Court **GRANTS** Martinez's motion for summary judgment.

### I.    BACKGROUND

#### A.    The Fight

Late one evening in St. Louis, plaintiff Andrew D'Angelo and his friend Jake Ehlinger went out for a night on the town. They started at the Budweiser Brew House around 11 PM, setting up in the VIP lounge and ordering bottle service. (D'Angelo Dep. at 24:8-25:24, 31:22–32:6, 155:19-156:11, ECF No. 94-3.) The two began to drink. And after a few cocktails, the two flirted with a few young women—one of whom D'Angelo got particularly close with. (*Id.* at 289:5–290:12.) But at some point, D'Angelo left and went to a nearby bar for another drink. (*Id.* at 297:7-298:7.)

D'Angelo soon returned to the Budweiser Brew House, expecting to find his lady friend. (*Id.* at 160:1-21.) What he did not expect, however, was to find another man—Angel Perez—there with his arm around her waist. (*Id.* at 298:11-19.) So D'Angelo confronted Perez. "I don't think

1

she wants you, buddy," pronounced D'Angelo—or at least something along those lines. (*Id*. at 293:14–294:03.) D'Angelo thought he needed to protect this woman, whom he thought looked uncomfortable—although the woman later testified that D'Angelo was just jealous. (*Compare id*. at 293:4-294:3, *with* Soto Dep, 94:1–95:19, ECF No. 94-17.) But regardless, Perez responded aggressively, and the two got into a heated argument. Eventually other people intervened—including the Brew House manager—and D'Angelo and Ehlinger left for another bar in St. Louis. (*Id*. at 299:20–300:1.) Perez also left the Brew House with a few of his friends—baseball players Marcell Ozuna, Oscar Taveras, and defendant Carlos Martinez, along with a few others—and their group went to a nightclub across the river in East St. Louis, Illinois.

By happenstance, D'Angelo and Ehlinger also left and drove to that same club about an hour later—around 3 AM at this point. (D'Angelo Dep. at 161:15-162:3, 279:17-218:13, ECF No. 94-3.) They walked inside for a few minutes, but after their long night of hard living, they decided to walk back outside instead and buy a hot dog and soda at the food stand in the parking lot. (D'Angelo Dep Vol. II at 13:1-14:2, ECF No. 94-7.) But rather than getting hot dogs, the two got into a fistfight instead: three minutes after D'Angelo and Ehlinger went to the food stand, three people inside the club—Perez, Taveras, and Nate Jones—also went to the stand, as you can see on the security camera videotape. And when Perez and D'Angelo saw each other, their primal rages over their prior shared affection boiled back to the surface.

This is where the two stories start to diverge. D'Angelo says that Perez sucker-punched him, leading to a larger fight. (*Id*. at 16:19–18:9.) But an eyewitness said that D'Angelo was the one who started the fight: according to that witness, one of the men—presumably Perez—walked up to D'Angelo and yelled "what's up now," along with some profanity, which led D'Angelo to push that man. (Hope Dep. at 63:23–64:20, ECF No. 94-14.) There is video footage of this incident from the security cameras at the club which corroborates the testimony that D'Angelo and Perez

2

were the initial aggressors, and it appears that D'Angelo pushed Perez to begin the fight—but it is difficult to come to a definitive judgment.

But stop. You might be thinking: the defendant in this case is not Perez, Taveras, or Jones. It's Carlos Martinez. So where was he? The security footage shows that before the fight started, Martinez was leaving the building towards his car—very close to a different security camera, and you can see him perfectly. It appears that he was walking with someone, as he gestured a person to follow him. But then the fight started, so people all around started running over to see what was happening—including Martinez. And when Martinez arrived at the scene, he saw Oscar Taveras punch John Ehlinger—plaintiff D'Angelo's friend—in the face. You can then clearly see Martinez enter the frame, grab Taveras, and drag him backwards to stop the fight. And then things settled down, and most of the crowd started moving to a different area of the parking lot near the entrance to the club.

Soon after, an employee of the club approached Taveras, and Taveras said he was leaving and started walking towards his car. (Rambo Dep. at 27:12–28:2, 30:2–5, ECF No. 94-13; Hope Dep. at 97:5-9, ECF No. 94-14.) But then, something happens—it is nearly impossible to tell from the footage exactly who struck whom given how far away this part of the brawl happened from the security cameras, but people started running back to the scene once again. D'Angelo testified that his friend Ehlinger was somehow involved in the brawl restarting, although it is not clear whether he was the initial aggressor. (D'Angelo Dep. Vol. II at 23:14–24:21, ECF No. 94-7.) Regardless, it doesn't matter much: it is very clear from the video that neither Maritnez nor D'Angelo was responsible for the brawl starting again, and in fact, they were far from the scene. One camera shows D'Angelo later running back to the scene near the front of the crowd, while Martinez slowly walks behind at the tail-end of the crowd. Neither D'Angelo nor Martinez appears agitated or even aware of the other.

Then, we have about a 28-second period where you cannot discern what happens from the security footage: the fight moves slightly up, so you can only see everyone from the shins down. This is D'Angelo's story on what happened: he says that he threw a punch at a "real skinny" man wearing a red shirt, but then he says that another person—whom D'Angelo later identifies as Martinez—came out of nowhere and clobbered him in the right side of his face, knocking him unconscious. (*Id*. at 24:22–25, 25:3–10, 26:15–19; 31:12–32:20; 34:2–36:22.). But then D'Angelo says that he regained consciousness, stood up, and tried to stop his buddy Ehlinger from yelling. (*Id.* at 37:17–38:5.) But there is one strange part of his story: at the time of the incident, he had no idea who hit him. It was not until two days later that D'Angelo looked at the St. Louis Cardinals' roster online and identified Martinez. (*Id*. at 47:25–49:13.)

Martinez, on the other hand, tells a much different story. He says that he never hit anyone during this second encounter. (Martinez Dep. at 22:10–12, ECF No. 94-15.) Instead, Martinez walked up at the tail-end of the fight to speak to nightclub security guards who were holding down Perez: the man whom D'Angelo skirmished with at the Brew House over the woman they were both interested in. (Rambo Dep. at 327:15–16, ECF No. 13.) And a nightclub security guard backed this up: he said that Martinez never hit anyone at this point, but that Perez was the aggressor and needed to be contained.[1] (*Id.* at 234:25–235:6, 241:2–18, 327:25–328:16.) And two other eyewitnesses also swore that Martinez did not hit D'Angelo. (Carson Decl. at ¶¶ 13, 15, ECF No. 94-4; Ozuna Decl. at ¶¶ 13, 15, ECF No. 94-5.) In fact, no eyewitnesses here testified that Martinez ever hit D'Angelo.[2]

---

[1] Martinez also offered into evidence witness statements from other club security guards, along with video interviews by the Sauget Police Department. (*See* ECF No. 94, pp. 10–11.) These statements are hearsay under Federal Rule of Evidence 801 and 802: out-of-court statements offered to prove whether Martinez punched D'Angelo, with no exception applying. *See United States v. Breland*, 356 F.3d 787, 792 (7th Cir. 2004) (explaining when witness statements do and do not qualify as hearsay). The Court will not consider them.

[2] D'Angelo argued in his brief, and later at oral argument, that eyewitness John Hope later told D'Angelo that Martinez punched D'Angelo in the face during the fight—which contradicts Hope's deposition testimony. (*See* Hope Dep. at

And then, we have an evidentiary godsend that clears things up. Someone pulls out their cell phone and starts recording. And it shows security guards holding Perez on the ground. It shows another guard holding back Ehlinger. And it shows Martinez approaching a few security guards to speak to them, and someone subsequently yells "let's go" in Spanish. The guards then release Perez, and everyone begins to disperse. This verifies what Martinez and the other eyewitnesses testified to: Perez and Ehlinger were the ones fighting, security guards pinned Perez down, and Martinez spoke to security guard holding Perez and convinced him to release him.

But the cell phone continues to record. And Ehlinger—the plaintiff's friend—was not done. Even though everyone was walking away, he continues to yell, swear, and approach the group, screaming "you motherfuckers are dead." And then, the third fight of the night starts. Martinez erupts: he runs and performs a leaping strike at Ehlinger in a move more suited for a Bruce Lee film than a nightclub brawl, while a woman in the background yells "Carlos!" But again, he struck *Ehlinger*—not D'Angelo, the plaintiff. And when Ehlinger stumbles back and D'Angelo grabs him, Marcell Ozuna—who is part of Martinez's group—runs up and punches D'Angelo in the side of the face, although it is not clear whether the punch was targeted at Ehlinger or D'Angelo.

D'Angelo then starts screaming at Ozuna. A security guard pushes Ozuna back. And then D'Angelo does something incredibly stupid: he puts his hand behind his waistband and yells "Do you want to get shot?" Ozuna then breaks free of the guard and promptly decks D'Angelo square in the face—that ended the fight. But the cell phone continues to record—and it shows Martinez's group leave, while D'Angelo and Ehlinger go back to the side of the building. D'Angelo lays down on the concrete—looking potentially unconscious—and that is the end. That entire series of events

---

14:24-15:5, 19:10-20:12, 53:23-55:7, ECF No. 94-14.) D'Angelo said that he intended to introduce that prior statement under Federal Rule of Evidence 613(b) as evidence that Martinez punched him, but he can do no such thing. Rule 613(b) is not an exception to the hearsay rule—it only allows a party to introduce prior inconsistent statements as impeachment evidence. *United States v. Severson*, 49 F.3d 268, 272 (7th Cir. 1995). D'Angelo accordingly cannot rely on Hope's alleged off-the-record statement in his case-in-chief, as he previously asserted.

between D'Angelo and Ozuna is strangely similar to the acts that D'Angelo accuses Martinez of: that Martinez punched him in the side of the head and knocked him unconscious.

Several years later, D'Angelo sued Carlos Martinez and the nightclub security company. There are four claims against Maritnez: assault, battery, civil conspiracy, and in-concert liability. The assault and battery claims are standard fare. (*See* Am. Compl. ¶¶ 27–35, ECF No. 27.) The civil conspiracy and in-concert liability claims, however, are a bit more farfetched: D'Angelo says that after he got into the argument with Perez at the Brew House, Perez and his group—which includes Martinez—simply must have conspired to follow and attack D'Angelo later in the night. (*Id*. at ¶¶ 36–46.) And now, both D'Angelo and Martinez have filed motions for summary judgment against each other. Martinez argues that the Court should enter summary judgment in his favor on all counts (ECF No. 94), while D'Angelo asks the Court to strike a number of Martinez's affirmative defenses. (ECF No. 80.)

## II. LEGAL STANDARDS

The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). When responding to a motion for summary judgment, the nonmoving party may not simply rest upon the allegations contained in the pleadings, but must

present specific facts to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322–26; *Anderson*, 477 U.S. at 256–57; *Modrowski*, 712 F.3d at 1168. A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

### A. Assault and Battery

The elements of assault and battery are well known. Battery is the "unauthorized touching" of another person. *Fiala v. Bickford Sr. Living Grp., LLC*, 43 N.E.3d 1234, 1240 (Ill. App. 2d 2015). Assault is intentionally putting fear in another person that they are going to suffer an imminent bodily injury. *Parrish by Bowker v. Donahue*, 443 N.E.2d 786, 788 (1982). And here, D'Angelo says that Martinez assaulted and battered him during the second part of the fight: that 28-second period where you cannot tell for sure what is going on in the security video. D'Angelo specifically says that Martinez punched him in the side of the face, knocking him unconscious.

This raises a poignant question about the summary judgment standard. Both in his brief and at oral argument, D'Angelo repeatedly reminded the Court that it is bound to view the facts of this case in the light most favorable to him: the non-moving party. And D'Angelo is correct that what he says is a well-established tenant of the summary judgment standards. *Anderson*, 477 U.S. 255.

But those standards do not give the non-moving party leeway to write fanciful stories about what happened, as D'Angelo tries to do here. D'Angelo asks the Court not to consider this case to be a bar fight, but instead frame it as a brazen attack against innocents—him and his friend

7

Ehlinger—simply because D'Angelo is the non-moving party. That request, and D'Angelo's view of both his own and Martinez's conduct in this case, is blatantly contradicted by the security and cell phone footage. The Supreme Court has dealt with this same exact issue before and gave the following instructions:

> "There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question…Respondent's version of events is so utterly discredited by [the videotape] that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."

*Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The Court must do the same here, and when looking at the videotape, no reasonable jury could believe that Martinez ever hit D'Angelo—not to mention that nobody could watch the footage and think that D'Angelo was an innocent victim of a brazen attack. To begin, we know that Martinez did not hit D'Angelo during the first fight at the food stand. The camera shows Martinez entering the scene late, when he grabbed his friend Taveras and pulled him back. There is no dispute there.

Next, consider the evidentiary record on the second part of the fight. The videotape shows that when this fight began, much of the crowd—including both D'Angelo and Martinez—had moved away from the food stand and towards the nightclub. But then the fight begins, and people start heading back to the food stand. That includes D'Angelo, who moves rather quickly, and Martinez, who meanders over very slowly. You then have that 28-second period where it is hard to tell what is going on in the footage: you can only see the lower part of everyone's bodies. But the eyewitnesses said that this fight was between Perez and Ehlinger, with D'Angelo and Nate Jones also getting involved at some point. And Martinez testified that when he entered the picture, it was to talk to the security guards who were, at that point, holding Perez to the ground. And then the cell phone starts to roll—and that videotape corroborates all of the eyewitness testimony:

8

Security is holding Perez to the ground; Martinez is talking to security; and more security is holding back a belligerent Ehlinger.

The problem here is that D'Angelo testified that Martinez punched him and knocked him unconscious during this second part of the fight. But the only evidence of that is D'Angelo's own self-serving testimony—and his testimony is completely contradicted by all of the eyewitness testimony, and that eyewitness testimony is corroborated by the videotape. Although the Court is bound to view the facts in the light most favorable to D'Angelo here, his story "is so utterly discredited by the record that no reasonable jury could [believe] him." *Scott*, 550 U.S. at 380–81. And this Court "should not [rely] on such visible fiction; it should [view] the facts in the light depicted by the videotape." *Id.* All of the evidence in this case shows that Martinez did not hit D'Angelo.

But there is something else going on here: the third part of the fight shows that D'Angelo's allegations make a bit more sense. Remember, D'Angelo's allegations in this case are that Martinez punched him in the side of the face, knocking him unconscious. And during the third part of the fight, the videotape shows *Ozuna* punching D'Angelo in the side of the face, and again in the center of his face—knocking D'Angelo to the ground, where he appears to be unconscious. And if you also remember, D'Angelo could not identify any of the attackers in this case until he looked at a St. Louis Cardinals' roster online two days later, when he picked out Martinez. Every reasonable jury who looks at these videotapes and hears the eyewitness testimony could only come to one conclusion: Martinez did not punch D'Angelo in the side of the face and knock him unconscious. But Ozuna did. And Ozuna is not the defendant here. D'Angelo's assault and battery claims against Martinez accordingly must fail.

**B.     Civil Conspiracy and In-Concert Liability**

9

These last two claims are not difficult. D'Angelo's theory is that because he and Perez got into an argument at the Budweiser Brew House over the woman they were both interested in, and because Martinez was friends with Perez and was also at the Brew House, then Martinez, Perez, and all their friends simply must have crafted a plan to attack D'Angelo. D'Angelo also says that when Perez, Taveras, and Jones left the club three minutes after D'Angelo and Ehlinger did and walked to the food truck, they must have done so because they wanted to attack the two friends— and not because they wanted a hot dog too.

But D'Angelo has no evidence to support any of this. The elements of civil conspiracy are "(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004). And in-concert liability under the Restatement (Second) of Torts § 876 requires a defendant to either (1) commit a tortious act with another pursuant to a common design, or (2) give substantial assistance to another who is a breaching a duty, or (3) give substantial assistance to another in committing a tort and, separately considered, breach his own duty to the third person. *Winters v. Wangler*, 898 N.E.2d 776, 793-94 (Ill. App. 4th 2008) (quoting Restatement (Second) of Torts § 876 (1977)).

And here, none of those elements are met. There is no evidence that Martinez "conspired" with anyone to follow and attack D'Angelo—especially considering the fact that Martinez's group arrived at the nightclub long before D'Angelo did. D'Angelo also argued that Martinez must have been involved in a conspiracy to attack him because Perez, Taveras, and Jones walked out to the food stand a few minutes after D'Angelo and Martinez did—but there is simply zero evidence that any of these people agreed, conspired, or planned a common design amongst themselves to carry out an attack on anyone.

Instead, this was a plain old bar fight. And other courts agree that conspiracy claims stemming from brawls like this one should not pass the summary judgment stage—they are not conspiracies. *Lyons v. Adams*, 257 F. Supp. 2d 1125, 1136 (N.D. Ill. 2003); *Henderson v. Hartshorn*, No. 08-CV-2086, 2011 WL 11464, at *1-2 (C.D. Ill. Jan. 4, 2011), *Plambeck v. Stone*, 662 F. Supp. 298, 301 (N.D. Ill. 1986). And the in-concert liability claim fails for a similar reason: D'Angelo argued that Martinez and Perez engaged in the same conduct—punching D'Angelo—outside the food stand during the second part of the fight, meaning that there must have been an implied "common design" in their actions. Restatement (Second) of Torts § 876, cmt. A (1976). But as the Court has already held, no reasonable jury here could find that Martinez hit D'Angelo at any point, and even beyond that, the Court is dubious as to whether a bar fight like this one ever gives rise to an "implied agreement" to attack someone—for the same reasons that bar fights fail in the civil conspiracy context. The Court accordingly must dismiss the civil conspiracy and in-concert liability claims as well.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Martinez's motion for summary judgment. (ECF No. 94.) The Court **DISMISSES** all claims against Martinez **WITH PREJUDICE** and **DIRECTS** the Clerk of Court to enter judgment in Martinez's favor at the end of this case. Finally, because Martinez is dismissed, the Court **FINDS AS MOOT** D'Angelo's partial motion for summary judgment on Martinez's affirmative defenses. (ECF No. 82.)

**IT IS SO ORDERED.**

**DATED: MAY 10, 2019**

s/ *J. Phil Gilbert*
**J. PHIL GILBERT**
**U.S. DISTRICT JUDGE**
